Good morning, Your Honors. May it please the Court, Carolyn Wiggin from the Federal Defender's Office for Mr. Clemans, and I am going to try to reserve five minutes for rebuttal. Your Honors, I know there are many issues in this appeal, and I will start by just addressing Count 1. In Count 1, Mr. Clemans is charged for a trip to the Philippines for the purpose of having illicit sex. Your Honors, that trip occurred entirely between Thailand and the Philippines. It was planned in the United States, though, wasn't it? Pardon me? It was planned when he was in the United States. He began contemplating it in the United States. He did not buy an airline ticket. But he emailed with directions on what he wanted to do. He emailed someone in the Philippines trying to set up a sexual encounter, but he never planned to travel between the United States and the Philippines. He said, Someday I'll make it to the Philippines, sometime this fall, hopefully I'll make it there. But he didn't actually buy a plane ticket, set up dates, set up any plans. It sure looked like he was intending to, at some point, end up in the Philippines. It looks like, yes, and we don't dispute that, but the question is, was that travel? The crime here is not the government could have pursued illegal sex in the Philippines. For this trip, it did not do that. It pursued the charge of travel with intent. With a purpose. For the purpose of illicit sex. We maintain that travel took place between Thailand and the Philippines entirely. Ms. Wiggin, is it your claim, is it your position that under the 2423B, travel from the United States is an essential element of foreign commerce? Well, it has to, yes, it has to have a nexus. Why? The statute doesn't say travel from the United States. It says an American citizen who travels in foreign commerce. Right. And the term foreign commerce. Why not travel from Thailand to the Philippines? That's foreign commerce. He's an American citizen. He travels for the purpose of illicit sex. All the elements of the statute are there. Now, you may have an argument saying, yes, but the indictment said he traveled from the United States and they have to prove all the facts of the indictment. My question to you is, is that accurate? Do you have to prove all the facts of the indictment? Suppose the indictment said he traveled from the United States wearing a gray suit. Do you have to prove that he also wore a gray suit? Well, Your Honor, could I answer that question in two parts? Could I answer that question in two parts? Sure. I believe the government and our side are in agreement that foreign commerce has been interpreted under that statute to mean travel with a nexus to the United States. We do not deny that a trip that is truly travel, a vacation, to begin and end in the United States, you're constantly traveling during that, even if you have layovers in multiple countries. My problem is why is travel, does it have to have a nexus with the United States? Well, that's discussed in the Weingarten opinion most extensively from the Second Circuit. That was an earlier case involving 2423B, and it had to do with a constitutional challenge to the statute. And I didn't really raise that issue, so I apologize that I'm not, that I think the Weingarten decision says it best, but they talk about case law and statutes interpreting foreign commerce and what can Congress do under this power for foreign commerce, and they say it means a tie to the United States in a foreign country. Are you contesting that he didn't set up the whole plan to have sex with little girls in the Philippines while he was in the United States? He began to contemplate it. Are you contesting that? Not contemplating. Are you contesting that he began the planning? No, I'm not contesting that. But I think the plan was for a trip not between the United States and the Philippines, but between a foreign country and the Philippines. Okay. So what's your definition of travel under this provision, and what case do you rely on to support it? I think Jackson is the clearest case we have on the meaning of travel. I think travel can be obviously from the United States. Travel in foreign commerce can be from the United States to a foreign country. It can also be a vacation or a business trip that is going to start in the U.S. The length of time is not particularly important, but it's a journey that will start and end in the United States. It's not a one-way ticket. Do you contend, is it your position that when he went to, I guess it's Thailand, that he intended to live there permanently? Certainly, that he intended to set up residence or domicile there. There's not a lot of evidence. Did he do anything to give up his residency in the United States? Well, he moved there. He accepted a job with a Thai-based company that was there. He was there on 30-day and then 90-day visas, correct? Which is what one would get if one were coming there with permission to work in the country. Is there any evidence what he would have had to do to get a permanent visa or a permanent residency in Thailand? Well, Your Honor, we discussed in the reply brief the fact that he had permission from the Thai government to work there. He had a job with a Thai-based company. The agent for the government, the FBI special agent, agreed he was residing in Thailand starting in September of 2013. And I think when we look at, as Jackson says, what do we normally mean when we use the word travel? We mean you're on a trip of a duration and you're coming home, and we know you are. And we also can look at the Pepe case. Did he return to the United States at all during the time that he was in Thailand? He visited a couple of times. Well, he's a United States citizen. Yes, he is. Okay. Yes. Can I ask you, the sentencing transcripts indicate that the defendant agreed prior to sentencing and again affirmed it at sentencing that Guidelines 2G1.3 were going to apply to Counts 1 and Count 2. Do you dispute that? No, that was the position of the defendant at sentencing. Okay. But he's challenging that now? Yes. We're saying it should be. Even though he agreed to it at sentencing? Well, actually, I think the guidelines, the PSR called for like 2A3.1. He said, no, it should be 2G. 1.3. And now we say that's plain error. It should have been 2X1.1. You know, if it's plain error, it has to be obvious to the district judge just looking at this. What would be the difference between figuring out a 2G1.3 and 2X1.1? So when you're in 2X1.1, which I think plainly applies to conspiracies and attempts. You look to the substantive count for the base offense level? You do, but. And then you add all appropriate adjustments, which come out to 42. Well, I would argue that, as we argued in the brief, that he wouldn't have gotten the four-level adjustment for sadism. Remove that. It still comes out to a 42. Base offense level is. I'll just get my PSR. I think it's. If you look at the PSR, I think it's. Base offense level, I think, is a 36. Under 2G1. Under 2G1.3, it's a 36. I'm looking at group three. I'm looking at base offense level 32, paragraph 47 of the PSR. And then. You had four points for the child being. Well, you have to count each of those three victims under three separately. Right. For unit reasons. So A was seven years old. And actually the adjustments are the same for each of them. Four points for being under 12. Two points for sexual act or contact. Which we don't dispute with. Under 12, we can't. No, and we don't dispute paragraph 49 for Angel. We do dispute that there's evidence on appeal for the other two victims on that. Okay. Do you dispute the sexual act or contact? Not with Angel. For the seven-year-old. Correct. And then there's. We dispute paragraph 50.4 level. Of a computer. And the role adjustment. That's two. Role adjustment is two. And that takes it to 42. For the first child. Right. And for Nicole, the nine-year-old. What do you dispute on that one? For that one, we dispute the paragraph 59. That that's a sexual act or sexual contact. Okay. The district court found that that was a kneeling nude child, nine years old, in front of another victim with a tongue extended toward her vagina. Right. Is that right? Okay. Let's just. So you're arguing that that's not a sexual act with two children? No. There's a statutory definition that makes it pretty clear there has to be contact. And there's not in that picture. Okay. And that's use of a computer and a role adjustment. Right. And then, so you. Even so, it's still going to be a separate unit. Even if you take it down to a 40. Right for Nicole? Correct. And then the 10-year-old has all the same adjustments. Right. That would. I can see where that would land at 40 and be a unit. Okay. So that's three units. So if you group. You still come out at a 42 for count three with three units. Right. Now, I'm arguing for acceptance. Okay. Half a unit each for one and two. Counts one and two. Right? I haven't gone that far with the analysis, so I'm not prepared to. But okay, I accept that for the sake of argument. And then you complain about grouping, not grouping four with three. So we still come up with three and a half units. That's grouping three, five, and six. Three and a half units, and it's chapter what? Chapter nine that says. Chapter three that if you've got three and a half to five units, you add another four levels. So that's 46. So at 46, chapter five says, 5A, app note two, that above level 43, you treat them all as a 43. So you're still going to have a 43. If you're at the 46 and one acceptance, you're never going to get more than two points. So that's 44. Well, Your Honor, obviously I'm hoping to. And if you group four with the others, you're still going to have three and a half units to add to 42. I'm hoping that we get reversal on count four as part of it. Okay. And I think if the guidelines were wrong, I think that we send it back down. Even if you uphold all the counts, which I think I have strong arguments. But that just takes away a unit if you get a reversal on four. Correct. But you're still at three and a half units, still saying, unless I'm missing something, still saying you're going to be at a 43, which is life imprisonment. I believe, I don't want to agree with that, because I believe that 42 becomes, the most serious count becomes the top. 42. Right. Which is three. Okay. And then if you get two levels down. For what? For acceptance, you go down to 41. That's not going to happen. If it does, you're not going to ever get more than two. Okay. I'd like to come back to district court and argue all that. If you agree that there were serious errors made at sentencing. I don't think they're going to matter. That's my point. I'm wondering. I would like a shot at it if you agree. Sure. Well, that's your job, and you're doing a good job. Thank you. I don't mean to criticize you. No, no, I appreciate it. And I see I've used a lot of my time. I think we deserve acceptance because he put his, first of all, he either admitted as to counts three, five, and six, or did not deny any of the facts in this case. He, at no benefit to himself, allowed the government to take over his e-mail account, and that allowed for a sting operation, which was the only way they stopped the two women in the Philippines, the only way they found the victims who were then important witnesses against him in his own case. So I think that his help to the government at his own expense was deeply discounted, and he should get acceptance. I think both of the trips described in count one and two did not have a nexus to the United States or were not specific enough. And as to count four, I think this is a situation where Congress has said if liability is going to be based on the offer to get custody, that offer has to travel in interstate or foreign commerce. Mr. Clemens organized someone in the Philippines to make offers. To buy these three little girls. To pay for them to, yeah, be available to produce child pornography, which is a serious offense. He's going to do very serious time, as you've pointed out, regardless of what happens with this appeal. But I do think that for count four, we don't have the offer being made in interstate or foreign commerce. And I will try to reserve my time unless there's any questions I can address now. That's okay. Thank you. We'll hear from the government. Government. Good morning. Pardon me. Good morning, and may it please the Court, Andre Espinosa for the United States, the Epilee, Iowa's trial counsel below. Your Honors, there is more than sufficient evidence in the record to support the defendant's convictions on counts one, two, and four. Likewise, the sentencing errors, if any, do not result in our harmless error and do not affect the defendant's substantial rights in this case. They don't affect the guidelines. They, unless, only the most unusual course could affect the guidelines, but it's the government's position that the district court did not abuse its discretion in withholding the two points for acceptance that the images constituting or characterized as sexual contact, which is an alternative basis for application of the two-level enhancement. Those images are part of your motion that you filed with us. Yes, Your Honor. Those aren't the images that the district court relied on. The district court relied on one image that's not disputed, an image related to the victim, Nicole, the 7-year-old. The other image is there's some dispute over whether they satisfy the specific statutory definition for sexual contact. The images that the government offered in its motion to supplement the record were images of these same victims and that are undeniably satisfied the requirements for application of that information. But they presented to the district court at the time of sentencing? They were included in discovery, Your Honor. That's not my question. Were they presented to the district court at the time of sentencing? Just yes or no. They were not presented to the district court, Judge. But did the probation department have them when they calculated the guidelines? Yes, Your Honor. The probation department did have them and they identified them. Is that in dispute? Your Honor, that is. Sorry. No, I'm happy to answer that now. I think she had access to them. But she did not rely on those pictures that she justified that assessment. Let me just ask this. Who makes the ultimate decision, the probation officer or the judge? The district court does, Your Honor. In the PSR, the probation officer did refer to the many photographs that she reviewed in preparation of the PSR, but she selected images that are the source of the dispute today. Okay. Your Honor, first I'd like to address count for the buying count. In that count, Your Honor, the jury was presented with overwhelming evidence sufficient for a rational jury to have convicted a defendant on that count. As counsel pointed out, a defendant violates 2251 Capital A, B, subsection B, when that defendant purchases or otherwise obtains custody or control of a minor or offers to purchase or otherwise obtain custody or control of a minor with knowledge that as a result, the minor will be used to produce images of child pornography. In this case, Your Honor, the record contained many multiple instances in which the defendant made offers directly to his co-conspirator, Leanne Tandig, in foreign commerce, a fact that he conceded, that he stipulated in a stipulation with the government that the communications with Ms. Tandig traveled through the Yahoo servers, through the United States, and back to Manila. In those offers, the defendant specifically offered to otherwise obtain custody or control of the three minor victims, at least, who were the subject of the pornographic images that Ms. Tandig produced at Mr. Clement's instruction. Now, the control element is satisfied here by the very specific poses that Mr. Clement's directed his co-conspirator to pose the victims in. He required that they appear in very specific ways. He sent sample images for Ms. Tandig to match those child victims and pose them in accordance with. He controlled the way their faces looked, the way their expressions were. He controlled how their hair looked. He controlled whether their bodies were oiled or not and what clothing they wore. Indisputably, the record establishes that he obtained control of those minors through the offers he made to Ms. Tandig and that those minors were used in multiple photo shoots, which he directed. But in addition, the defendant made specific offers in foreign commerce to take personal custody and control over the victims. In September of 2014, for example, from the United States while visiting his mother or back at his mother's residence, a residence that he frequently shared, Mr. Clement sent a message to his co-conspirator in which he stated, this is at Supplemental Excerpt of Record 224, I would like to do more photo shoots with Nicole. If she agrees, I'm going to clean up his language to sex during my next visit. I want to have a photo session with us together having sex for my collection. Three days later, the defendant paid his co-conspirator Lynn Tandig $500. In the message supporting that payment, he wrote, in return we get Nicole for a photo shoot and sex with me for three days. That's at SER 226. On October 20, 2014, the defendant confirmed that the $500 he had paid a month earlier was so that he could personally take custody and control of Nicole. He wrote, I have her for as long as I want. It might be a couple of weeks and she will not be able to go home at night. She stays with me. That's at SER 262. On the same day, the defendant offered to buy Angel, another victim, for sex and explicit photo shoots. He wrote, once I pay the money in full, Angel is ours to do as we please. It will be more than just sex with her. I will need at least seven more photo shoots in the next few months. That's at SER 262 through 263. Did the district judge have the photograph referred to of Nicole? Yes, Your Honor. So that one is not disputed? It is not. So that still gives a level 42 even if you take out the pictures for the other two, the 10-year-old and the third child? That's right. Angel and Ishan are the co-names that the defendant and his co-conspirators used in those discussions. Okay, so taking out the pictures that we don't think the district judge had, the district judge still had the one of the sexual act of Nicole, which still gives the two-level adjustment. That's correct, Your Honor. Your Honor, in addition on this buying count, the statute does require that the offer be transmitted in, communicated or transported by means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means. And the government argued both at trial and argues today that the offers that Mr. Clemons sent to his co-conspirator were supported by and caused financial transactions from Mr. Clemons' bank account in the those offers affected interstate and foreign commerce. There was sufficient evidence in the record for the jury to convict the defendant on that count. Okay, how about counts one and two? Your Honor, on counts one and two, the record also contains sufficient evidence for the jury to have convicted the defendant. As the court pointed out, the superseding indictment, the second superseding indictment, did allege that the defendant traveled from the United States to Manila through Thailand. And that allegation accounts for the holding of the Second Circuit in 2011 in its opinion in Weingarten. Although this court has not required a territorial nexus between the United States and travel and foreign commerce, in an abundance of caution the government both alleged and proved the territorial nexus. And here that territorial nexus is demonstrated in chats. In the first 18 pages of the government supplemental excerpt of record, those chats chronicled the defendant's communications with a separate criminal partner, Nelia Cruz, between approximately August 31st, 2013 and September 11th, 2013. And in those chats the defendant sets up in detail an arrangement to pay Ms. Cruz to obtain minors for him to travel to Manila to engage in illicit sexual conduct with. For example. May I interrupt you for just a second? Yes, sir. Is it the position of the government that a nexus with the United States is an essential element of culpability under 2423B? This court hasn't required it, but it is. I didn't ask that. I asked you what is the government's position. Your Honor, this court should require a territorial nexus. Should require it. Yes. Okay. And in this case there is abundant evidence of that territorial nexus in the form of those communications I referenced. Can you tell me why under the statute a territorial nexus is required? The statute is an extraterritorial. I have in mind this. An American citizen who lives abroad and earns money and doesn't report it on his IRS return is committing a crime if he does it intentionally with fraud. Right? It doesn't have to have any connection at all with the United States. He commits a crime and he can be prosecuted. My question was why is there a necessity of an element of nexus of the United States in this travel? Well, here, Your Honor, the statute punishes. Its language is it punishes a U.S. citizen who travels in foreign commerce for purpose of engaging in illicit sexual contact. Isn't travel between Thailand and the Philippines in foreign commerce? The jury instructions in this case instructed the jury that travel in foreign commerce means travel from the United States. All right. So we have to rely on those jury instructions. In this case, Your Honor, yes. And on the basis of those instructions, the government offered sufficient evidence to prove that this was travel from the United States. So the argument, though, that counsel made on behalf of her client was that he traveled from Thailand to the Philippines, not from the United States. What's your definition of travel under this statute? And on what case do you rely? Well, Your Honor, the government contends, consistent with cases in both the Fifth Circuit and the Third Circuit, that if a United States citizen forms a provable intent to travel for the purpose of engaging in illicit sexual conduct in a foreign country, he's guilty when he boards that means of travel and leaves the U.S. territory. That's the holding of Pendleton, United States v. Pendleton, a 2011 Third Circuit case in which the Court focuses on, distinguishes between 2423b and 2423c and states it says the locus delectae of 2423c is where the sex occurs, not as in 2423b, which is where the intent is formed. Similarly, a case that was argued below is Breedemist, the Fifth Circuit case. In that case, the district – here the district court cited the district court from the Northern District of Texas's opinion in that case. In that case, the defendant left Dallas, traveled ultimately to Cambodia, but first made three – two, at least two intervening stops, business stops in Tokyo and Hong Kong. And the district court held that because the – in the district court opinion, the argument was over the extraterritorial application of the statute. The district court held that it assumed the government would adduce evidence of the violation of his intent to travel for that illicit purpose at trial, and so the district court denied the motion. Our cases seem to suggest that one could leave the United States, travel to Thailand or some other third – some other country, and then form the intent, and then travel to, say, the Philippines, and that that doesn't – our case – our case law seems to suggest that if they're in that second country for a substantial period of time, that that may not qualify as travel under this particular provision. Your Honor, the development of the case law in this area – Within the – I'm talking about the Ninth Circuit. Within the Ninth Circuit. It focused previously on the question of residency and what the meaning of travel is. In the most recent opinion by this Court, United States v. Pepe, this Court shifted the focus of analysis from residency to travel and – and inquired into the meaning of travel and said travel means what it says. It means has a person permanently resettled from the United States in a foreign country or evidenced otherwise an intent to permanently resettle in a foreign Is there any evidence here in the record to – that the jury relied on to suggest that he hadn't resettled under Pepe? Well, there were both – there were both his acts and his statements. First, his acts. He moved to Thailand. He was not – he was there on a visa that required him to leave first every 30 days, later every 90 days. He did – he complied with that visa and left frequently. He was gone from – he returned to the United States first approximately eight months after he left in September of 2013. He spent a month in the United States in California at the residence where he was later arrested in July of 2015. After he returned from that first visit, he returned back to the United States four months later. He went back to Thailand and returned to the United States seven months later. His regular returns to the United States established a cadence of activity that intent to return to the United States and not to permanently resettle. Moreover, his words established that. In April of 2014, the defendant ordered a computer to his home in Sacramento. In a written email criticizing the manner in which the computer was – or complaining about the manner in which the computer was delivered, he wrote, I ordered a computer to my home. He didn't say my mom's home, the home that I stay at when I'm not living in my permanent residence in Thailand. He wrote my home. He further wrote, I'm overseas at the moment and I'll be back in May. Those statements evidence his intent to return. Let me answer this. So if there's – if you believe that there's sufficient evidence in the record that would support the jury's finding using Pepe or Jackson, why would we need to look at the Fifth Circuit and the Third Circuit? Those opinions are only instructive and provide some guidance, Your Honor, but I agree that under this Court's interpretation of the meaning of travel in Pepe, Mr. Clemens continued to travel. In Pepe, the defendant had been living in Cambodia for five years, returned to the United States for a brief trip, and was later prosecuted for engaging in illicit sexual conduct back in Cambodia. He was prosecuted under 2423C. Right. I understand that. In that case, though, notwithstanding this Court's decision to reverse the conviction and remand, the Court sent it back for potential retrial and expressly noted that the government, if it was able, could prove that the defendant was still traveling after five years if it could offer facts sufficient to obtain a conviction. Those facts were offered in this case, and the jury both saw them and they were argued. In closing, and it's in the record, the defense argument was this isn't travel. The intervening stop in Thailand breaks the territorial nexus. The jury rejected that argument, and it did so on the basis of the evidence in the record. So why don't you switch to the sentencing, the alleged sentencing errors. Judge Jett really worked her way through. How do you respond to the arguments that are advanced? Well, Your Honor, our primary— If you take all of her arguments and you give them credit for it, what happens? Where are we at? Well, first, Your Honor, I think on the question of acceptance, the district court did not abuse its discretion. That standard is extremely high, and here the record supported the district court's determination that acceptance was not appropriate. Clemens argues that the district court inappropriately relied on his silence or his unwillingness to speak about incriminating statements during his interview with probation, but that is not what the district court did. The district court considered the government's reference to not Clemens' silence, but what Clemens did say. What he said about his acceptance really was this series of self-serving statements that he had given money to children in orphanages in Manila. He had donated food. Which could have many meanings. Which could have many meanings, but certainly didn't constitute acceptance and expression of contrition or remorse. The district court rejected the defendant's argument for acceptance, and the government's argument was that the weight of the evidence, the nature and circumstances of this crime were so serious, so severe, that even in light of the defendant's very modest cooperation, his willingness to offer his password to agents after they asked, but after some time passed from his July 2015 arrest, that that effort was outweighed by the seriousness and gravity of the offense. That is not an abuse of discretion. So off the top, I think this court takes off those two points. The next argument is the use of 2X1.1 for the conspiracies. That, there is simply no error. It could not have affected, even if there was error in failure to use 2X1.1, the application of 2X1.1 would not have altered the guideline calculations. That is, the defendant was not entitled to the three-point reduction available under 2X1.1, because as the provision in 2X1.1b2 states, if a co-conspirator or the defendant completes all the acts believed necessary on their part for successful completion of the substantive offense, the three-level reduction is not available here. There was sufficient evidence in the record that Ms. Tandag completed all of the portions of her part of the conspiracy for both counts that this guideline would have applied to, the conspiracy to produce and the conspiracy to travel with the intent to engage in illicit sexual conduct. That is, on one hand, concerning the production conspiracy. She certainly made the images in conformity with the defendant's instructions and sent them to him. And with respect to the conspiracy to travel, she followed every direction that he gave. She used the computer that he paid for. She used the camera that he paid for. She identified victims consistent with his request. When she identified victims that he wanted further photographs taken of, she took those additional photo sessions. And when he instructed her to find a place for him to engage in this illicit sexual conduct, she said to him, I will do that. And she said whether she did that is not necessary, but she agreed to do that and agreed to take additional steps in furtherance of the conspiracy. All those facts are sufficient for the district court to have denied application of the three-point reduction here. That's the 2X. They don't get the 2X if he or a co-defendant completed the offense, the substantive offense. That's right, Your Honor. And there's certainly enough evidence to show that, I believe. That's right. If the court agrees on those two counts, then even if the court finds error in the calculation of the guideline range concerning certain of the other arguments that Clemens raises, none of those arguments would change the guideline calculation sufficient to take the offense level below 43, the range consistent with life. Here the range was 50, and it is only if this court found multiple error and disagreed on what I think are the two strongest sentencing arguments, acceptance and application of 2X1.1. I see I'm running out of time. Let me ask you this. Do you acknowledge any error? Well, insofar as the court did not apply 2X1.1, it may have been error. It clearly applies to the conspiracy counts. But it is not error that results in substantial harm to the defendant. It doesn't change the guidelines at all. It does not change the guidelines at all. The ex post facto claim is not an ex post facto error, as the briefing suggests or makes clear. The guideline exists in both handbooks for 2012 and 2016. My time has expired. Okay. Thank you very much, counsel. Thank you, Your Honors. I'll try to be brief here. I'm going to start with count four because that was what I believe my opponent started with first, the offer to obtain custody count. I would encourage this court to look at its own decision in Corab, which I cited in the opening and reply briefs. In that case, a defendant reaches out to co-defendants and says, please extort this person who lives in Phoenix. The co-defendants travel to Phoenix and they go ahead and make the extortionate threat entirely within Phoenix. And in that case, this court recognized the extortionate threat was not made in interstate commerce. Yes, somebody asked co-defendants to go do that within a certain state, but the actual threat was made entirely intrastate. Here, the offer, which my counsel has talked about, many of the appalling offers Mr. Clemons made, they were all asking Lyon Tandag within the Philippines to make offers. And, in fact, all the offers ended up happening face-to-face in the Philippines. So that's our position on count four. With respect to this issue of travel, which both sides agree has to have a nexus to the United States, I would say if we look at Pepe, it recognizes Congress in 2018 amended 2423C again, and now it says if you travel in foreign commerce or if you reside temporarily or permanently in a foreign country and have illicit sex, that is criminalized. So I think it's – and then it goes back and re-looks at Clark and says, oh, now we understand that travel means something differently than residence because Congress chose to amend the statute. So I would say you would have to say Mr. Clemons was at least temporarily residing in Thailand. I don't know. He may have had plans to permanently. It really didn't get addressed below. But certainly he was temporarily there in an apartment with a job that was required, jumping through quite a few official hoops to obtain. And so I think what the district court's error was, it looked at the question of, well, can two months – could a person be in travel for two months? I would say, yes, a person can be in travel for two months, but Mr. Clemons was not in travel for two months. He was a resident of Cambodia. And I know there is evidence that he was contemplating this trip in the United States, but I would point out the crime is actually travel with intent. It's not – he was contemplating sex in the Philippines. And the Eighth Circuit's case – But let me ask you, is there any evidence in the record that when he was in Thailand that he communicated with his cohorts in the Philippines? There's a lot of evidence that while he was in Thailand, he's continuing to talk to her, and it's for two months. So his purpose, which started in the United States, just continues on, correct? Well, he wants to get to the Philippines and have sex. But his purpose in traveling to Thailand is to move to Thailand, take up residence, start a job. Then he plans another trip. Now, maybe he was planning it already. How do we know that? Did he testify at court and trial? He did not. So how do we have any information about his purpose? Well, there's lots of text messages that came into evidence between himself and the person in the Philippines. So for that reason, we know he's thinking of this trip, but he is thinking of a trip between a foreign country and the Philippines. And we say that's not enough for Counts 1 and 2. Thank you. Thank you, counsel. Thank you all for your excellent presentations on this case. And the matter is submitted at this time. Thank you all very much. And that ends our session for today.
judges: Paez, Bea, Jack